The **NATIONAL NUTRITIONAL FOODS ASSOCIATION and Solgar Co., Inc., Plaintiffs,**

v.

**Caspar W. WEINBERGER, Secretary of Health, Education and Welfare, and Alexander M. Schmidt, Commissioner of Food and Drugs, Defendants.**

**No. 73 Civ. 3448.**

United States District Court, S. D. New York.

Sept. 25, 1973.

Bass & Ullman, New York City, for plaintiffs.

Paul J. Curran, U. S. Atty., for the S. D. of N. Y., Naomi L. Reice, Asst. U. S. Atty., Joanne S. Sisk, Chief App. and Sp. Proceedings, Dept. of Health, Education and Welfare, for defendants; Stephen H. McNamara, Atty., Office of Gen. Counsel, Dept. of Health, Education and Welfare, of counsel.

## MEMORANDUM

FRANKEL, District Judge.

On October 1, 1973, regulations of the Food and Drug Administration will become effective requiring that preparations of Vitamin A and Vitamin D in excess of 10,000 I.U. (international units) per dosage unit and 400 I.U. per dosage unit, respectively, shall be restricted to prescription sale and that such vitamins shall be labelled accordingly. The regulations read as follows:

21 C.F.R. § 3.94

"(a) Vitamin A is an essential nutrient for humans. It is widely recognized that large amounts of vitamin A can cause adverse effects, some of

which are serious. The U.S. Recommended Daily Allowance (U.S. RDA) for vitamin A is 1500 International Units, (IU) for infants, 2500 IU for children under 4 years of age, 5000 IU for adults and children 4 or more years of age, and 8000 IU for pregnant or lactating women.

"(b) In view of the toxicity of excessive consumption of vitamin A, the Food and Drug Administration finds that, in order to protect the public health, oral preparations containing vitamin A in excess of 10,000 IU per dosage unit or recommended daily intake are drugs subject to section 503(b)(1) of the Federal Food, Drug, and Cosmetic Act and shall be restricted to prescription sale. Such products will be regarded as misbranded if at any time prior to dispensing the following conditions are not met:

"(1) The label bears the legend, 'Caution: Federal law prohibits dispensing without a prescription'; and

"(2) The labeling bears full disclosure information as required by § 1.-106(b)(3)(i) of this chapter, and especially appropriate warnings regarding vitamin A toxicity.

"(c) Preparations containing 10,000 or less IU of vitamin A per dosage unit will be regarded as misbranded if their recommended daily intake exceeds 10,000 IU."

21 C.F.R. § 3.95

"(a) Vitamin D is an essential nutrient for humans. It is widely recognized that vitamin D, when ingested daily in large amounts, is toxic. The U.S. Recommended Daily Allowance (U.S. RDA) for vitamin D is 400 International Units (IU).

"(b) In view of the toxicity of the excessive consumption of vitamin D, the Food and Drug Administration finds that, in order to protect the public health, oral preparations containing vitamin D in excess of 400 IU per dosage unit or recommended daily intake are drugs subject to section 503(b)(1) of the Federal Food, Drug, and Cosmetic Act and shall be restricted to prescription sale. Such products will be regarded as misbranded if at any time prior to dispensing the following conditions are not met:

"(1) The label bears the legend, 'Caution: Federal law prohibits dispensing without a prescription'; and

"(2) The labeling bears full disclosure information as required by § 1.-106(b)(3)(i) of this chapter, and especially appropriate warnings regarding vitamin D toxicity.

"(c) Preparations containing 400 or less IU of vitamin D per dosage unit will be regarded as misbranded if their recommended daily intake exceeds 400 IU.

"(d) Foods which are represented for use solely under medical supervision to meet nutritional requirements of persons with poor vitamin D absorption may contain vitamin D not in excess of 1000 IU per dosage unit or recommended daily intake."

This is an action charging that the quoted regulations are invalid and seeking to enjoin their enforcement. The plaintiffs have moved for a preliminary injunction. The extraordinary relief thus sought must be denied upon the findings of fact and conclusions of law outlined below.

The plaintiffs are the National Nutritional Foods Association, a trade association composed of manufacturers, wholesalers, and retailers of vitamins and dietary supplements, and Solgar Co., Inc., a New York corporation which manufactures, distributes, and sells vitamin supplements.

The immediate background of the regulations in question begins with their promulgation by the Commissioner of Food and Drugs as proposed regulations in the Federal Register dated December 19, 1972 (37 Fed.Reg. 26618). These regulations were corrected in minor detail in the Federal Register dated January 4, 1973 (38 Fed.Reg. 799). The

Commissioner promulgated these regulations for the "efficient enforcement" of §§ 502(a), (f), and (j), and 503(b) of the Food and Drug Act as authorized by 21 U.S.C. § 371(a), under powers delegated to him by the Secretary. 21 C.F.R. § 2.120.

Explaining what were then his tentative views, the Commissioner said:

"The acute and chronic toxicity of these vitamins is documented extensively in the medical literature. Vitamin A is available over the counter in dosage levels up to 10 times the recommended daily dietary allowance (RDA) of the Food and Nutrition Board, National Academy of Sciences–National Research Council (NAS–NRC) and vitamin D is available up to 60 times the RDA. The availability without prescription of these vitamins in high dosage levels contributes significantly to their misuse and the occurrence of serious adverse effects." (37 Fed.Reg. 26618 (1972)).

Adverse effects which the Commissioner found from excessive intake of Vitamin A include among others anorexia, growth retardation in children, migratory arthralgia and intracranial pressure. Adverse effects resulting from an excess of Vitamin D include anorexia, weight loss, polyuria, certain forms of calcification, hypertension, anemia, irreversible renal failure and death. In respect of Vitamin D the Commissioner noted that some of these severe effects are irreversible, and that the margin of safety between nutritional requirements and toxic levels is small.

An extensive bibliography listing the scientific articles used by the FDA in formulating its proposed regulation was placed on public view.

When the Commissioner published the proposed rules and their rationale he provided 60 days in which interested parties might comment, in accordance with the rulemaking provisions of the Administrative Procedure Act. (5 U.S.C. § 553(c)). The response was massive. Over 2500 comments were received. Of special interest for present purposes, the two plaintiffs herein, as well as other drug companies, presented substantial amounts of factual material and expert opinion opposing the proposed regulations. Others made extensive submissions pro and con. The mass of these presentations has been lodged with the court and fills some 45 manila folders.

The commentators, responding to the Commissioner's invitation, fall into three general categories:

(1) Those who agreed that prescription levels are necessary and that those proposed by the FDA were suitable. This group included official representatives of the American Academy of Pediatrics, the American Medical Association, the American Dietetic Association, and other medical and scientific experts.[1]

(2) Those who agreed that prescription levels were necessary but argued that the levels should be higher than those set by the FDA. These groups included most drug manufacturers and trade associations as well as a few individual consumers. Several of these commentators made a critical review of the scientific literature used by the FDA, arguing generally that "toxicity below 50,000 IU daily for vitamin A was rare and that vitamin D toxicity reports would not support the vitamin D level proposed." (38 Fed.Reg. 20724 (1973)).

(3) Those who disagreed with the proposal entirely, arguing that vitamins are foods and that individuals should have the right to use any amounts they desire. Most individual consumer comments as well as comments from health food retailers fell in this category. Such commentators pointed out that the dosage level of vitamins in many foods is higher than the prescription level— for example, 100 grams of liver contains

[1]. One group of commentators, mainly scientists and medical researchers, argued that the Commissioner should actually set lower unit limits for prescription sales.

at least 24,000 I.U. of vitamin A—and that a limitation on vitamins and not on food substances is irrational.

Having considered the factual and legal materials submitted for his expert judgment, the Commissioner concluded that the regulations now assailed should be adopted. (38 Fed.Reg. 20723 (1973)). As grounds for this determination he noted that:

"The concern of the Food and Drug Administration is the availability of vitamin A and vitamin D in large dosage units in medicinal forms, i. e., capsules and tablets, particularly in view of the multiplicity of other sources of this vitamin in the daily diet. The convenience of ingestion in this form on a routine basis encourages excessive intake of these vitamins far beyond the average amounts ingested in normal diets of conventional food over extended periods of time. Adequate amounts of vitamin A and vitamin D will continue to be available as dietary supplements and are not being removed from the market place. The margins of safety provided in the levels established by this proposal were developed to take into account the wide ranges of vitamin content in foods and the dosage levels of vitamin A and vitamin D preparations that are usually implicated in toxic conditions." (38 Fed.Reg. 20724 (1973)).

Aiming to establish a reasonable "margin of safety," the Commissioner concluded that the limits he had proposed were prudent and efficacious.

In support of their claim that the Commissioner's regulations are not valid —and, more immediately, that the invalidity and resulting injury are clear enough to warrant the extraordinary relief of a preliminary injunction—the plaintiffs argue that:

(1) The Commissioner has exceeded his statutory authority in that he has improperly classified vitamins as drugs when they are in fact food substances and beyond the range of the Commissioner's authority to regulate.

(2) In any case vitamins, even if classified as drugs, cannot be defined as a "prescription drug" within the ambit of 21 U.S.C. § 353, which these regulations are designed to effectuate.

(3) The Commissioner's decision to require prescription limitations for vitamin A and D is not supported by the medical and scientific evidence and is factually unreasonable.

None of these claims can be sustained.

■ (1) Plaintiffs argue that vitamins are food substances and thus not subject to FDA regulations as "drugs." The Commissioner has made the judgment, however, that vitamins are a food only when used within the limits of the recommended daily allowance. At such a level they, like ordinary foods, are "nutrients." Above those levels they are deemed "appropriate only for therapeutic purposes and thus are properly classified as drugs" (38 Fed.Reg. 20723 (1973)).

21 U.S.C. § 321(g)(1) defines the term "drug" as follows:

"(A) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any article specified in clauses (A), (B), or (C) of this paragraph; but does not include devices or their components, parts, or accessories."

■ This language is to be construed liberally in the light of the statutory concern for health and safety. See, e. g., United States v. Bacto-Unidisk, 394 U.S. 784, 792, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969); United States v. Sullivan,

332 U.S. 689, 693–697, 68 S.Ct. 331, 92 L.Ed. 297 (1948); United States v. Dotterweich, 320 U.S. 277, 280, 64 S.Ct. 134, 88 L.Ed. 48 (1943); United States v. Diapulse Corporation of America, 457 F.2d 25, 28 (2d Cir. 1972). Quite apart from rules of construction, and leaving aside the lay knowledge that the likeliest place to go for vitamins is the "drug store," the products here are squarely within the literal language and evident meaning of the statute. If there were more doubt, the question would surely be one on which to weigh further against plaintiffs the everyday experience and judgmental responsibility of the Commissioner. N. L. R. B. v. Hearst Publications, 322 U.S. 111, 130, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).

▮▮ (2) Plaintiffs argue that even if Vitamins A and D are to be denominated "drugs," they do not fall within the statutory definition of a "prescription drug" subject to the kind of regulatory authority the Commissioner has asserted. The provision in question is 21 U.S.C. § 353, which states in relevant part:

"(b)(1) A drug intended for use by man which—

\* \* \* \* \* \*

"(B) because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug

\* \* \* \* \* \*

shall be dispensed \* \* \* upon \* \* \* prescription \* \* \*."

It is plain that the concern over "potentiality for harmful effect" imposes broad responsibility upon the Commissioner to safeguard human health. He has acted well within that duty in setting upper limits at a level convenient and agreeable for affected consumers (including those who may want two or three pills to reach levels recommended by the most exuberant of vitamin enthusiasts) while affording protection through a safety margin against dangers which have been universally acknowledged even if they are not mechanically quantifiable at a precisely agreed level. The Commissioner is not only entitled but required to be at least as prudent as lay understanding of human behavior would dictate. He knows that almost nobody has a reliably identified need for as much as—let alone more than—10,000 daily units of Vitamin A.[2] He knows, because we all do, of the prevalent wisdom among us pill swillers that "if one is good, two are better." He knows such things as the widely held belief in the efficacy of Vitamin A for acne, and he knows that moderation may not be the chief attribute of those troubled by this condition. Knowing such obvious things and other matters less patent, the Commissioner is not required to circumscribe his responsibilities in terms solely of the completely "rational" consumer. He may and he must consider the "potentiality for harmful effect" through excessive use to the merely "average" man and even to the substantial numbers of us who help create the average by falling below it.

▮ Both plaintiffs and defendants agree that toxicity exists at some level. Plaintiffs' quarrel with the Commissioner is over the dosage point at which some restrictions would become prudent. The Commissioner, however, is not required to set the over-the-counter limit at a maximum which the consumer (be he old, young, weak or strong) might withstand. See United States v. Bodine Products, 206 F.Supp. 201, 207 (D.Ariz. 1962). A substantial margin of safety probably should—certainly may—be used, at least in a case like this, where it can have only beneficial effects for the Commissioner's paramount subject of health.

"One making a rule for the future which in practical effect will deter-

---

2. Comparable observations apply to Vitamin D.

mine whether millions of people shall eat something every day may reasonably refuse to subject the general public to even slight risks and small deceptions." Atlas Powder v. Ewing, 201 F.2d 347, 355 (3d Cir. 1952).

 (3) Plaintiffs launch a variety of procedural and "evidentiary" attacks upon the factual premises of the regulations. None of these seems meritorious.

The Commissioner's judgments about safety levels (in the admittedly uncertain and debated state of knowledge) and consumer habits are solidly grounded. If the question were for *de novo* decision, the court would probably decide as he did. But it is enough to say his determinations are reasonable and rational.

Though they had ample opportunity to present anything pertinent to the FDA, plaintiffs urge that they should be permitted to make a new record here, presumably to show that the Commissioner must be denounced as "arbitrary and capricious" on the basis of materials he was not invited to look at. The argument would appear to lack merit, but it need not be resolved finally for present purposes. Moving with the relative dispatch required by the occasion, the court has considered all the materials submitted, including those the Commissioner was not given. The result remains that the rationality of the questioned regulations unquestionably survives the effort to block them by a preliminary injunction.

The balance of the equities is heavily against the plaintiffs. They have offered some unimpressive figures for the expense of relabeling their vitamin bottles and putting up new pill strengths— for all of which the Commissioner gave long notice before the effective date of his regulations. Informed that the figures were vague and unenlightening, plaintiffs expanded the alleged numbers *in a brief*. The result remains less than imposing.

If people want 20,000 or 30,000 units of Vitamin A, they can dose themselves with two or three pills—or, better still, see a doctor first. As the court has attempted to indicate, this sort of mild obstacle to the swallowing of toxic amounts seems compellingly sensible—a quality not necessarily objectionable for regulatory decisions.

In short, the public interest in health quite overwhelms the financial concerns plaintiffs urge.

Beyond that, the likelihood that plaintiffs will succeed in this action seems negligible.

There are, then, no grounds for, and powerful grounds against, a preliminary injunction.

Plaintiffs' motion is denied. So ordered.