**PHARMADYNE LABORATORIES, INC., Plaintiff,**

v.

**Donald M. KENNEDY, Commissioner of Food and Drugs, United States Department of Health, Education and Welfare, Frederick R. Carlson, Food and Drug Administration, District Director, Newark District Office, and the United States Food and Drug Administration, Defendants.**

Cir. A. No. 78–2792.

United States District Court,
D. New Jersey.

Jan. 10, 1979.

Bass, Ullman & Lustigman, New York City by Milton A. Bass, Sheldon S. Lustigman, Jacob Laufer, New York City, for plaintiff.

Robert J. Del Tufo, U. S. Atty. by Charles J. Walsh, Asst. U. S. Atty., Newark, N. J., Eugene M. Pfeifer, Associate Chief Counsel for the FDA, Rockville, Md., for defendants.

OPINION AND ADDENDUM

MEANOR, District Judge.

This case arises out of dictum contained in *United States v. Articles of Drug (Lannett),* 585 F.2d 575 (3d Cir. 1978), *rehearing en banc denied.*[1] Presently before the court is an application by the plaintiff, Pharmadyne, for a preliminary injunction restraining the Food and Drug Administration (FDA) from litigating the new drug status of two of the plaintiff's products in condemnation actions before the Eastern District

---

1. December 1, 1978. Immediately thereafter, the FDA commenced the seizure actions mentioned below. *See* Laufer Affidavit ¶¶ 9, 10 and 11.

of New York and the District of Connecticut.[2]

The issues posed are, in my judgment, grave and deeply involved with the public health and safety, for the thrust of the plaintiff's argument is that a generic drug manufacturer can market a "me-too" drug without premarketing clearance by the FDA. There is also, I believe, a necessity for prompt decision and appellate review which may give the Third Circuit an opportunity to review its *Lannett* decision. Such review might halt an FDA assault on various Federal Courts around the nation which has been undertaken in an effort to precipitate a conflict with *Lannett* so as to provide a vehicle for Supreme Court review. There can be no question that the FDA believes that the *Lannett* decision is incorrect and will follow and apply it only under extreme compulsion.

Because of the necessity of issuing a prompt decision, there is insufficient time to retell in this opinion the history of drug regulation by the federal government, an understanding of which is necessary in order to place the present issues in context. Fortunately, that history is well documented and can be gleaned from consultation of the following authorities. *Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *Ciba Corp. v. Weinberger,* 412 U.S. 640, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973); *Weinberger v. Bentex Pharmaceuticals,* 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); *USV Pharmaceutical Corp. v. Weinberger,* 412 U.S. 655, 93 S.Ct. 2498, 37 L.Ed.2d 244 (1973); *United States v. Articles of Drug (Lannett), supra; Hoffman-LaRoche, Inc. v.*

*Weinberger,* 425 F.Supp. 890 (D.D.C.1975); Note, Drug Efficacy and the 1962 Drug Amendments, 60 Geo.L.Rev. 85 (1971); Note, The Drug Amendments of 1962: How Much Regulation?, 18 Rutgers L.Rev. 101 (1963).

## I. The *Lannett* Decision.

In *Lannett,* the government brought a condemnation action against several of Lannett's drugs. The core issue was whether the drugs were "new drugs" within the meaning of 21 U.S.C. § 321(p)(1) and thus could not be marketed without premarketing FDA clearance pursuant to 21 U.S.C. §§ 355(a–d). The entire appellate record in *Lannett* has been made available to me. The government there achieved summary judgment at the trial level upon the ground that Lannett could not relitigate in the district court the FDA's previous classification of its drugs as "new drugs." *United States v. Articles of Drug (Lannett),* No. 76–254, slip op. at 4 (E.D.Pa. May 16, 1977). All of the Lannett drugs involved had been marketed with FDA approval while awaiting premarketing clearance under prior FDA procedures invalidated in *Hoffman-LaRoche v. Weinberger, supra,* a decision in which the FDA acquiesced. That case held that a "me-too" drug could not be marketed without premarketing clearance under the 1962 New Drug Amendments.[3] I believe that case and *Lannett* are in a head-on clash. Following *Hoffman-LaRoche,* the FDA, without approving Lannett's pending Abbreviated New Drug Applications (ANDAs), 21 C.F.R. § 314.1(a), (b),[4] sought to condemn Lan-

---

**2.** At oral argument, I was informed that an additional such action has been started in Florida and that a fourth action is contemplated. Tr. at 4, 56. *See* Bernheim Affidavit ¶¶ 3 and 4.

**3.** The 1962 New Drug Amendments changed the premarketing clearance procedures. Under the 1938 Act, new drug applications were deemed approved within a fixed period unless the Secretary took affirmative steps to reject the application. However, the 1962 amendments required the FDA affirmatively to express its approval of new drug applications prior to permitting the marketing of new drugs

in interstate commerce. Judge Green in *Hoffman-LaRoche* went one step further in holding that "me-too" drugs required premarketing approval. She did so on the ground that it was not within the intent of the 1962 amendments to allow such preclearance marketing and, moreover, this practice violated the FDA's own regulations. 425 F.Supp. at 894.

**4.** An ANDA is a short form drug application requiring proof that the individual manufacturing process for a particular drug yields an effective product. In addition, ANDAs include adequate data to assure the biologic availability

nett's drugs. After pointing out that Lannett effectively had been denied an opportunity for an administrative hearing on the status of its products as new or old drugs, the Court of Appeals reversed and directed the district court to permit Lannett to contest the FDA's classification of its drugs as "new drugs." 585 F.2d at 581–82.

Thereafter, the court, in Part IV of its opinion, in a considered dictum, proceeded to discuss for the guidance of the district court on remand the definition of "new drug" set forth in 21 U.S.C. § 321(p)(1). In determining whether a product is a new drug that requires premarketing clearance, the court cast aside considerations of bioequivalence, bioavailability, quality control and the potential effect of different manufacturing processes.[5] It restricted evaluation of new drug status to general safety and effectiveness. The Lannett drugs in question purported to be "me-too" or generic copies of pioneer drugs that had been marketed for substantial periods. The court noted the FDA concession that these pioneer drugs, which Lannett claimed to be copying, were generally recognized by qualified experts as safe and effective. Once this was established, the court indicated that the inquiry was ended and that such "me-too" drugs would not fall within the statutory definition of a new drug. 585 F.2d at 583–84.

In my opinion, there is serious question as to the correctness of the *Lannett* dictum limiting as it does the definitional criteria

of the drug and to determine the bioequivalence thereof in the particular manufacturer's formulation. *See* 21 C.F.R. §§ 320.1(a), (e), (f)—320.62 (1978). Filing an ANDA was intended to ensure that each version of a generic drug would match the generic compound certified as effective in the DESI notice, (Drug Efficiency Study Implementation notice), in which the FDA certified particular drugs as "effective" for use pursuant to the 1962 New Drug Amendments.

5. I question whether, in light of the 1962 New Drug Amendments, the legislative history and subsequent rules and regulations promulgated pursuant thereto, such considerations should be set aside.

First, bioavailability of a drug means the "rate and extent to which the active drug ingredient or therapeutic moiety is absorbed from a drug product and becomes available at the site of drug action," 21 C.F.R. § 320.1(a) (1978), that is, the degree to which a drug or other substance becomes available to the target tissue after administration. *Dorland's Illustrated Medical Dictionary* 200 (25th ed. 1974). Bioequivalence speaks of pharmaceutical equivalents, whose rate and extent of absorption do not show a significant difference when administered at the same molar dose of therapeutic moiety under similar experimental conditions. *See* 21 C.F.R. § 320.1(e) (1978).

Both bioavailability and bioequivalence are of necessity concerned with the interplay of active and inactive drug ingredients. For example, an applicant may waive evidence of *in vivo* bioavailability data, normally required for NDA or ANDA approval, 21 C.F.R. § 320.22, where the drug product meets a number of conditions, one of which is that the drug contains no inactive ingredient known to significantly affect absorption of the active drug ingredient. 21 C.F.R. § 320.22(a), (b)(5), (iii) (1978). In addition, when analyzing bioequivalence criteria, the Commissioner must consider a number of factors to identify specific pharmaceutical equivalents that may not be bioequivalent drug products. Such factors include physiochemical evidence that specific inactive ingredients may be required for absorption of the active drug ingredient. 21 C.F.R. § 320.52(e)(6) (1978).

Secondly, quality control and the likely potential for differing manufacturing processes are also of significance. Bioequivalence criteria mandates that the active drug ingredients have a low solubility in water, a certain particle size and/or surface area, certain physical structural characteristics, a specific degree of absorption, protections thereto to assure adequate absorption, and indicia that there will be absorption in large part in a particular segment of the gastrointestinal tract or from a localized site. 21 C.F.R. § 320.52(e), (f) (1978). In addition, changes in manufacturing processes, including a change in product formulation or dosage strength, require FDA scrutiny before a drug product is marketed. *See* 21 C.F.R. § 320.21(b) (1978).

Accordingly, such considerations do impact upon safety and effectiveness of new drug products. Although "me-too" drugs may carry the same general qualities as the pioneer drug, the potential for significant variances therein is clear. Control over and supervision of absorption rates of active drug ingredients, physical structural characteristics such as hardness, the important interplay of active and inactive drug ingredients, dissolution rates, dosage strength, release factors, product formulation, milligram control and the like, are necessitated in light of the dangers of releasing improperly formulated drugs for ingestion by the public.

to be employed in the determination whether a product is a new drug. As I see it, when a drug manufacturer markets a "me-too" copy of a recognized drug under the *Lannett* dictum he may do so without any premarketing clearance, leaving the FDA to post-marketing action to remove from commerce any such drug that does not meet recognized therapeutic or purity standards.

This *Lannett* dictum was a not a mere obiter dictum but was considered or judicial dictum. Even so, I do not believe that I am obliged to follow it, but recognize that it is entitled to the greatest respect and is to be given considerable weight. *United States v. Bell,* 524 F.2d 202, 205–06 (2d Cir. 1975); *Gabbs Exploration Company v. Udall,* 114 U.S.App.D.C. 291, 315 F.2d 37, 39 (1962). If the present case were one where *Lannett* was precisely in point, I would apply and follow it. It will be explained later that *Lannett* need not be followed even if it is deemed to be controlling in this Circuit. First, however, I shall state the reasons why I believe that the *Lannett* dictum represents a misconstruction of the definition of new drug contained in 21 U.S.C. § 321(p)(1). That statute [6] defines the term as follows:

> The term "new drug" means—
> (1) Any drug . . . the composition of which is such that such drug is not generally recognized . . . (among qualified experts) . . . as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof . . . .

Despite a great deal of past waffling on the point, it is clear that the FDA has now construed the term "new drug" to mean new drug products. *See* Tr. at 82, 101. Under the FDA's construction, the new drug product of any manufacturer cannot be marketed without premarketing approv-al of a New Drug Application (NDA) or ANDA, even if that product purports to be en exact copy of a recognized drug—*i. e.,* a "me-too" drug. Tr. at 82. It thus takes issue with *Lannett* which I construe to mean that a "me-too" drug can be marketed without premarketing NDA or ANDA approval if its therapeutically active ingredients are identical to a recognized drug both chemically and quantitatively.

I believe that the construction advocated by the FDA is, highly arguably, supported by the statute.

It is clear that 21 U.S.C. § 355, requiring NDA approval of new drugs, uses that term to mean new drug products. The Supreme Court has so held. *USV Pharmaceutical Corp. v. Weinberger, supra,* 412 U.S. at 664, 93 S.Ct. 2498. It should be obvious that the application of the term new drug in § 355 ought to be used to shed light on the meaning of the term as defined in § 321. The statute must be read as a whole. What the *Lannett* court and plaintiff here, Pharmadyne, do is to compartmentalize the statute. They define new drug only by consulting the language of § 321 and do not look for interpretative guidance elsewhere within its contours.

In § 355(b), an NDA is to have a "full list of articles used as components of such drug" and a "full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug."

Components of a drug may well be (and usually are) things in addition to active ingredients. They may be the binder that permits the active ingredients to be administered in tablet form. Tablets often have an inert coating designed to encase the active ingredients and to permit them to be

---

6. Section 321(p)(2) contains an alternative definition of "new drug." 21 U.S.C. § 321(p)(2). This is designed to include as new drugs some products which, nonetheless, would satisfy the definition of subsection 1. Subsection 2 makes new drugs out of products which by reason of investigation into safety and effectiveness have become recognized by experts, but which have become so recognized as to safety and effec-tiveness, only on the basis of such investigations and have not thereafter been used to a material extent or for a material time. Subsection 2 was mentioned at oral argument, Tr. at 17, but is not relevant to this case. In order for a medication to be considered under subsection 2, it would first have to pass the definition set forth in subsection 1, and be an "old drug" thereunder.

swallowed. Capsules have an encasement which dissolves in the digestive tract permitting release of the active ingredients. If these inert ingredients were a concern of Congress for a novel drug, it is entirely unclear to me why they would not be of similar concern in the manufacture of a "me-too" product. It was conceded at oral argument that the quality of the inert ingredients may be related to efficacy. Tr. at 17–19. If the tablet is too hard, or the binder indigestible so that the active ingredients are not released properly or timely, the drug's efficacy may be impaired or destroyed. If the covering of a capsule is not readily digestible, the same result may occur.

In addition, as noted above, an NDA must contain a description of manufacturing methods, facilities and controls. Congress obviously deemed such factors of importance in determining whether a new drug should be approved. If they are important with respect to a novel compound, again I am entirely unclear why they are not equally germane to the marketing of a "me-too" drug.

Under § 355(d) the NDA must be disapproved if "the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to preserve its identity, strength, quality, and purity." If these factors, which have nothing to do with the safety and efficacy of the active ingredients, as such, are of sufficient import to deny approval of a novel compound, it does not make sense to me to say that they are irrelevant to a "me-too" drug.

I cannot divorce consideration of the meaning of "new drug" in § 321 from its application in § 355. Reading the two sections of the same statute together, it should be clear that Congress was concerned with such things as quality control, bioavailability and bioequivalence of the drugs prescribed for and consumed by the public.

It is argued that Congress made a legislative determination that such factors should be weighed in NDA approval of a novel compound, but eschewed them with respect to their later "me-too" counterparts. While that result may rationally obtain if one looks only at § 321, consideration of the statute as a whole seems to me to lend greater credence to the alternative interpretation advocated by the FDA. Clearly, if I were construing the meaning of "new drug" without binding authority, I would opt for the FDA's construction.

Although the statute is susceptible of the construction given it by the FDA, it may also legitimately be construed in the fashion of the *Lannett* court. It is a settled tenet of statutory construction that where a statute is reasonably susceptible to alternative constructions, and one of those constructions has been given the statute by the agency charged with its administration and enforcement, the latter is to prevail. *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). *See also Lehigh & New England Ry. Co. v. I.C.C.*, 540 F.2d 71, 80 (3d Cir. 1976); *McInnis v. Weinberger*, 530 F.2d 55, 63 (1st Cir. 1976), and cases cited therein. Strangely, this canon is mentioned neither in the *Lannett* opinion nor in the FDA's brief in that case.[7]

There is additional support in the statute for the proposition that all drugs—including "me-too" drugs—were desired by Con-

---

7. In *Lannett* the court found support for its thesis in *Weinberger v. Hynson, Westcott & Dunning, Inc., supra*. It cites that case as supportive of the proposition that " 'me-too' drugs carry the same qualities as generic drugs, irrespective of individual manufacturing differences . . . ." 585 F.2d at 584. In *Hynson*, the Supreme Court permitted the FDA to apply the withdrawal of an NDA to all "me-too" drugs, as long as all manufacturers had an opportunity to be heard. I think that the reliance on *Hynson* is misplaced. It is one thing to treat a pioneer drug and its "me-too" copies as the same for withdrawal purposes, yet quite another to treat them as the same for therapy. Where experience shows that a drug, at least as to its active ingredients, is unsafe or ineffective, that determination is obviously applicable to the pioneer product and its "me-too" copies. The converse certainly is not true, since many other things besides the identity and quantity of active ingredients enter the equation used in determining safety and efficacy.

gress to be subject to premarketing approval. Section 355(e) provides the Secretary (of HEW) with power to disapprove an approved NDA and this power may in an appropriate crisis be exercised in advance of hearing. Withdrawal of an approved NDA under this section provides an effective, efficient and speedy method of removing from the market a drug found to be dangerous. If "me-too" drugs are marketed without premarketing approval, such approval cannot be withdrawn and the FDA would be left to cumbersome and time consuming case-by-case institution of condemnation actions to rid the market of dangerous "me-too" drugs.[8] In fact, if "me-too" drugs are marketed without premarketing clearance the FDA may not even know that they are about. In the absence of an approved NDA or ANDA for a "me-too" drug, I am told, the only way the FDA would know which drugs a particular manufacturer was marketing would be from the semiannual reports required by 21 U.S.C. § 360(j)(2), 21 C.F.R. § 207. Tr. at 95. Thus, a "me-too" drug without premarketing clearance could be in commerce for as long as six months before the FDA would be aware of its existence.

The prospect of a medical crisis requiring the immediate withdrawal of an approved drug is not just an idle *in terrorem* argument by the FDA. *See* Tr. at 93–95. Though such things are rare, they do occur. When they do the prospects for disaster are immense, with tragic long term results. Fortunately, the Thalidomide tranquilizers

were not marketed in the United States, although they were in Europe. After their release it was found that they were teratogenic, that is they caused fetal skeletal deformities if taken during the first trimester of pregnancy.[9]

We have had in this country similar tragic episodes that are readily identified. The sordid story of Mer/29 is summarized in *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832 (2d Cir. 1967). That medication was designed to lower blood cholesterol levels. It did. It also caused cataract growth and was removed from the market. Then there is the saga of the Cutter polio vaccine. Supposed to be inactive polio virus so as to set up the body's immunological reactions, one batch of it contained live virus which caused polio. *See Gottsdanker v. Cutter Laboratories,* 182 Cal.App.2d 602, 6 Cal. Rptr. 320, 79 A.L.R. 290 (1960). Still another crisis developed surrounding the marketing of the broad-spectrum antibiotic, chloromycetin. This drug has frequently demonstrated a life-saving ability, but it can be injurious, even fatal, if its use is not carefully monitored. Its most serious side effect is the development of aplastic anemia. *Salmon v. Parke, Davis & Co.,* 520 F.2d 1359, 1361 (4th Cir. 1975). After a series of deaths in 1952 associated with this drug, the FDA ordered new warning labels. When further injury and deaths were reported, the FDA in 1961 added even stricter labeling requirements for the drug, 21 C.F.R. § 146d.301(c) (1962).[10]

---

**8.** *Cf. Weinberger v. Hynson, Westcott & Dunning, Inc., supra,* 412 U.S. at 626, 93 S.Ct. 2498.

**9.** Thalidomide was, however, licensed by its German developer to Richardson-Merrell, Inc. in 1958 for manufacture and distribution in North America. Although the Canadian Drug Directorate approved the drug in April 1961, the FDA withheld approval because it found testing data, supportive of the new drug application, insufficient. *See Henry v. Richardson-Merrell, Inc.,* 508 F.2d 28, 31 (3d Cir. 1975). Estimates are that if Merrell had been successful in marketing Thalidomide before the Spring of 1961, about 10,000 American babies would have been born with gross deformities. Turner, *The Chemical Feast,* The Ralph Nader Study Group Report on the Food and Drug Administration, *cited in* Shuster, Better As is Than Not

at All, New York Times, Apr. 29, 1973, at 14 (Magazine). It is noteworthy that the Thalidomide disaster directly resulted in increased Congressional awareness of the possibility of a medical crisis, culminating in the passage of the 1962 Amendments to the Food and Drug Act which greatly expanded the powers of the agency. *See Turkel v. Food and Drug Administration, Dept. of H.E.W.,* 334 F.2d 844, 845 (6th Cir. 1964), *cert. denied,* 379 U.S. 990, 85 S.Ct. 704, 13 L.Ed.2d 611 (1965).

**10.** For an excellent early summary of the law which evolved around the medical crises caused by Thalidomide, Mer/29, the Salk vaccine and chloromycetin, among others, *see* Rheingold, Products Liability—The Ethical Drug Manufacturer's Liability, 18 Rutgers L.Rev. 947 (1964).

If an approved drug is found after experience to have disastrous and unanticipated long term side effects sufficient to require its immediate removal from the market, the Secretary can act immediately against the pioneer drug by withdrawing its NDA approval prior to an expedited hearing. 21 U.S.C. § 355(e). Marketing after such action could lead to criminal prosecution. 21 U.S.C. §§ 331(d), 333(a) and 333(b); see United States v. Park, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975); United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943); Tr. at 96–98. No such easy route to eliminate dangerous "me-too" drugs exists and, as recited above, condemnation actions would be the necessary resort. See Tr. at 24. I doubt that in such an emergency Congress intended that some drugs could be withdrawn by immediate disapproval of an NDA while their "me-too" counterparts could only be forced from the market by condemnation.

By my latest count, 31 states have enacted generic substitution laws. See, e. g., N.J.Stat.Ann. 24:6E–1 et seq. (West Supp. 1978); Pa.Stat.Ann. tit. 35, §§ 960.1—960.7 (Purdon Supp.1978); Del.Code Ann. tit. 24, § 2589 (1976). Although these laws vary, they all provide a mechanism whereby the less expensive generic equivalent of a name brand drug may be substituted when the name brand is prescribed. It was established at oral argument that no post-1962 pioneer or "me-too" drug has to date been marketed without premarketing clearance by the FDA. Tr. at 39–41. In fact, all drugs approved by the FDA under the 1938 Act for safety only that are still being marketed have now been approved for efficacy as well. "Grandfathered" in are only those drugs marketed under the 1906 Act whose labeling has not changed. See 21 U.S.C. § 321(p)(1). I do not believe that it takes an evidentiary hearing to recognize that the medical profession in permitting generic substitution places great reliance on

this premarketing FDA approval. Since doctors can disavow generic substitution when writing a prescription, it should be obvious that they will have greater motive to do so if they realize that their patient may be getting a medication that the FDA has not approved. Tr. at 44. In addition to considerations of quality, purity, bioavailability and bioequivalence, it would seem logical that doctors also would be concerned with medico-legal exposure.

Thus, it appears to me that not only is there room in the statute to support the construction given it by the FDA, which should be given great deference, but policy considerations as well support that interpretation.

## II. Pharmadyne's Post-Lannett Actions Giving Rise To This Case.

Following the Lannett decision, Pharmadyne, without FDA premarketing clearance, put on the market diethylproprion hydrochloride, furosemide, and chlorothiazide with reserpine.[11]

The diethylproprion hydrochloride put out by plaintiff purports to be a "me-too" of Tenuate Dospan which is marketed by Merrell. The medication is a sustained release anorectic, designed for use in control of obesity. It is related to the amphetamines and the PDR [12] for Tenuate Dospan lists the manifestations of overdosage and the treatment therefor. It should be obvious that, as with any sustained release medication, if the quality control is not such that the release is adequately sustained and there is rapid "dumping" of the contents of the capsule, overdosage may result, and therapeutic efficacy would be lost.

Plaintiff's furosemide purports to be a "me-too" of Hoechst's Lasix, approved for years as a diuretic and recently approved as an anti-hypertensive. Pharmadyne markets the drug for both indications.

It is these two drugs which the FDA has sought to condemn, principally on the theo-

11. Chlorothiazide with reserpine is a "me-too" of Merck's Diupres, an anti-hypertensive. The government has not moved to condemn this drug and, hence, this case is concerned only with the first two medications mentioned.

12. Physicians' Desk Reference.

ry that they are "new drugs" being marketed illegally without NDA or ANDA approval. The thesis of the plaintiff is that it has the right to market these drugs without premarketing clearance under *Lannett* and it asks this court to restrain the condemnation actions insofar as they seek relief on the ground that these products are new drugs.[13] The government resists an injunction on various grounds, including this court's alleged lack of jurisdiction to enter one.

### III. The Government's Deference Argument.

Relying on *IMS Ltd. v. Califano*, 453 F.Supp. 157 (C.D.Cal.1977), the government points out that the FDA has jurisdiction to provide a ruling to Pharmadyne on the status of its drugs and asks the court to refer the issue to that body. There is no question that under *IMS Ltd.* and *Weinberger v. Bentex Pharmaceuticals, supra*, this court has the option of deferring to the FDA on this issue. However, a court should not require the doing of a superfluous act and it is apparent that to refer this issue to the FDA would lead to a foreordained result.[14]

As noted above, I construe *Lannett* to restrict inquiry on the new drug issue to the question whether the therapeutically active ingredients of the new product are chemically identical and quantitatively identical to the active ingredients of an established

product that passes the test and has become an old drug under § 321(p)(1). *Lannett* thus casts aside considerations such as quality of non-active ingredients, propriety of manufacturing and packing methods, bioavailability, bioequivalence, shelf life and the like. If the issue of the new drug status of plaintiff's product is referred to the FDA, that agency, unless under a command not to do so, will employ its construction of § 321(p)(1) that new drug means new drug product and will hold the two medications in issue here to be new drugs. Tr. at 109–10, 118–22.

On the other hand, if I order the FDA to evaluate Pharmadyne's two products under the *Lannett* dictum as I have interpreted it, there would be no alternative but for the FDA to find that they are not new drugs. The FDA conceded at oral argument that if thus restrained it would agree that furosemide and diethylproprion hydrochloride are generally recognized among qualified experts as safe and effective for their therapeutic indications. Tr. at 125. There has been no assertion that the active ingredients of plaintiff's products are not identical qualitatively and quantitatively to the pioneer drugs they copy. Thus, to send the issue of their status to the FDA would be of no avail.[15]

### IV. The Jurisdictional Argument.

Citing *Ewing v. Mytinger & Casselberry*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088

---

**13.** There are other theories advanced by the government in the condemnation actions sought to be enjoined, but the plaintiff does not ask for relief insofar as these theories are concerned. Plaintiff only seeks to restrain the actions to the extent they ·seek condemnation on the ground that Pharmadyne's furosemide and diethylproprion hydrochloride are new drugs being marketed without required premarketing clearance. In fine, plaintiff says that its two drugs are not new drugs as that term is defined in the *Lannett* dictum and, hence, the government should be restrained from proceeding on that basis.

**14.** Pharmadyne has also shown that despite the deferral to the FDA in *IMS Ltd.*, the FDA still has not acted and IMS has recently filed a fresh complaint in an effort to obtain a ruling on whether its product is a new drug. *IMS Ltd. v. Califano*, No. 78–3863 (C.D.Cal. complaint filed

Oct. 10, 1978). In this regard, the Fourth Circuit has pointed out that where a party suffers a legal wrong from continuing agency delay and there is no other adequate administrative or judicial remedy, the delay constitutes final agency action. *Deering Milliken, Inc. v. Johnston*, 295 F.2d 856, 866 (4th Cir. 1961).

**15.** The law does not require needless report to administrative proceedings as a prerequisite to equitable court intervention. *United States v. Zweifel*, 508 F.2d 1150, 1156 n. 6 (10th Cir. 1975); *Bannercraft Clothing Co. v. Renegotiation Bd.*, 151 U.S.App.D.C. 174, 466 F.2d 345, 359 (1972). *See also Locust Cartage Co. v. Transamerican Freight Lines, Inc.*, 430 F.2d 334, 340 n. 5 (1st Cir. 1970); *Crain v. Blue Grass Stockyards Co.*, 399 F.2d 868, 873 (6th Cir. 1968).

(1950); *Parke, Davis & Co. v. Califano*, 564 F.2d 1200 (6th Cir. 1977) and *Natick Paperboard Corp. v. Weinberger*, 498 F.2d 125 (1st Cir. 1974), the Government insists that this court has no jurisdiction to enjoin the FDA from bringing condemnation actions. Those cases can, of course, be read to sustain that broad proposition. Their general reasoning is that there can be no review of the administrative decision that there is probable cause to initiate such an action, and that due process rights are satisfied by the hearing afforded within the context of the seizure action.

I am unwilling to attribute to the judiciary complete impotence in the face of an arbitrary agency assault by the bringing of multiple seizure actions across the nation in defiance of the settled law of the land. If that were the case, as Pharmadyne seems to say it is, I should think a court would and could interfere. However, this issue need not be reached, for even if there were clear power to issue the injunction plaintiff seeks, it would not be exercised in this case.

### V. Pharmadyne's Basis For Injunctive Relief.

Pharmadyne does not contend that the *Lannett* decision is res judicata to it. Obviously, this is not so, for Pharmadyne was not a party to that action. The argument is that the FDA having litigated and lost on its interpretation of § 321(p)(1) should adhere to it unless and until *Lannett* is overturned by the Supreme Court. Pharmadyne, a New Jersey corporation located in Hackensack, insists that it has a right to rely on a decision of the Third Circuit and to market its products in accord with *Lannett*, and that the FDA should be estopped in its attempt to relitigate the rule of *Lannett* in other circuits. Heavy reliance is placed on *Blonder-Tongue Labs. v. University Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), and the critiques of the government's circuit-shopping litigation

policies set forth in the concurring opinions in *May Dept. Stores Co. v. Williamson*, 549 F.2d 1147, 1149 (8th Cir. 1977), and *Goodman's Furniture v. United States Postal Serv.*, 561 F.2d 462, 465 (3d Cir. 1977). The issue in the latter two cases was whether the Postal Service was subject to garnishment proceedings against the wages of its employees pursuant to state court judgments. In *May Dept. Stores*, Judge Lay would have applied *Blonder-Tongue* estoppel to the government's continued relitigation of this issue, which, by the time of the *Goodman's Furniture* decision, had been presented six times in the Courts of Appeals and 19 times in the district courts. *Goodman's Furniture, supra*, 561 F.2d at 463 nn. 1, 2. In *Goodman's Furniture*, Judge Weis was extremely critical of this governmental forum shopping. Both Judges Lay and Weis, however, recognized the beneficial effects of the "percolation" process, but held that principle to be inapplicable to the issue before them.[16]

Pharmadyne's argument has a great deal of surface plausibility. There is an appellate decision in its favor on the core issue of this case within the circuit of its location. Its marketing of the drugs in question is in accord with the considered dictum of *Lannett*. It points to the essential unfairness of having to meet and re-meet the *Lannett* issue in successive seizure actions brought in other circuits in studious avoidance of the Third Circuit by the FDA.

There may come a time when the government's repetitious litigation of the same issue will be put to an end by *Blonder-Tongue* estoppel. But for reasons stated below, assuming the power to apply such estoppel exists, this case does not present an appropriate vehicle for its exercise.

### VI. The Basis For Denial Of Injunctive Relief.

*Blonder-Tongue* did not announce an immutable fiat. Its basic holding is that a

---

16. In this respect, the institutional interests of the lower federal courts and those of the Supreme Court may differ. The lower courts, overburdened as they are, might like to be free from repetitive litigation over the same issue in different districts and circuits, unless, perhaps, there is at stake an issue of overriding public importance. The Supreme Court has a somewhat contrary interest to the end that it receive only well refined and precise issues. To achieve that often may take multiple decisions on a given point.

patent owner who has litigated and lost on the issue of his patent's validity is thereafter estopped from asserting such validity in succeeding litigation involving other parties. Mutuality of estoppel was set aside. However, the case carries within itself safeguards against the unjust application of its own estoppel doctrine. The patent owner may avoid estoppel in later litigation if he can demonstrate (1) lack of a fair opportunity to litigate validity in the earlier action; (2) application in the basic case of erroneous legal standards; or (3) a failure of the initial court to grasp the technical subject matter. 402 U.S. at 333–34, 91 S.Ct. 1434. The Supreme Court took pains to point out that no word formula could be supplied which would lead to automatic and correct rulings on the estoppel issue, and said: ". . . the court in the second litigation must decide in a principled way whether or not it is just and equitable to allow the plea of estoppel in the case before it." 402 U.S. at 334, 91 S.Ct. at 1445.

■ A grant of preliminary injunctive relief is, after all, a matter of the exercise of sound judicial discretion in which one of the paramount considerations must be the public interest.[17] There are several reasons why I believe that the injunctive relief requested should not be afforded on the basis of the *Lannett* dictum.

First, Pharmadyne's reliance is on dictum, albeit a considered one. Thus, *Lannett* may not be an apt candidate for Supreme Court review, and the projection of the argument that the FDA should seek such review rather than go circuit-shopping loses some vitality.[18]

Second, what I believe to be the inherent weaknesses of the *Lannett* dictum have already been explored at length. It cannot be over-emphasized that *Lannett* heralds a drastic change in the introduction into commerce of new drug products. Until now, no new drug products covered by the 1962 amendments have been introduced without premarketing clearance by the FDA. The issue is an important one on which there is vehement difference of opinion. I do not believe that the FDA should be bound irretrievably to it until its full ramifications have been explored. That will take further "percolation" in the courts.

Third, the FDA, charged as it is with the responsibility of safeguarding the public interest in the matter of drug marketing, has taken the position that no new drug products should be introduced without premarketing clearance.[19] Without such clearance,

---

17. *Asher v. Laird*, 154 U.S.App.D.C. 249, 475 F.2d 360, 362 (1973); *Penn Galvanizing Company v. Lukens Steel Co.*, 468 F.2d 1021, 1023 (3d Cir. 1972); *National Nutritional Foods Ass'n v. Weinberger*, 366 F.Supp. 1341, 1347 (S.D.N.Y.), *aff'd per curiam*, 491 F.2d 845 (2d Cir. 1973). In litigation involving the administration of regulatory statutes designed to promote the public interest, this factor becomes critical in the court's discretionary balance. *City of Boston v. Hills*, 420 F.Supp. 1291, 1297 (D.Mass.1976). *See also Virginian Ry. v. Federation*, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937); *Virginia Petroleum Job. Ass'n v. Federal Power Comm'n*, 104 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958). In *National Nutritional Foods, supra*, District Judge Frankel denied plaintiff's motion for a preliminary injunction seeking to enjoin the enforcement of certain FDA regulations. The plaintiff, in seeking injunctive relief, argued a construction of the term "prescription drugs" different from that of the agency. Judge Frankel construed the definitional language of the statute in light of the statutory concern for health and safety, 366 F.Supp. at 1345, and specifically noted that

the question of definitional construction is "one on which to weigh further against the plaintiffs the everyday experience and judgmental responsibility of the Commissioner [of FDA]." *Id.* at 1346. In denying the injunction, the court noted that the public interest in health quite overwhelms the financial interests plaintiffs urge. *Id.* at 1347.

18. I was told at oral argument that no decision had yet been reached on whether the FDA would seek certiorari in *Lannett*. Tr. at 89–90.

19. The FDA took this position in response to Judge Green's decision in *Hoffman-LaRoche, supra*. There, the district court held that, in light of the dangers inherent in releasing untested "me-toos" for ingestion by the general public, the FDA's prior policy of permitting the marketing of large classes of "me-too" drugs without approval contravened the clear statutory requirement of premarketing clearance mandated by 21 U.S.C. § 355 (1970) and the FDA's own regulations. 21 C.F.R. §§ 314.1(a), (f), 314.012 (1974). 425 F.Supp. at 894.

I believe that substantial public danger from the introduction of new drug products exists. This is exactly the position of the FDA—the agency charged with the Act's administration and enforcement, and an agency possessed of extensive expertise in the field. I have some doubt that the *Lannett* court appreciated, on the record before it, the fact that safety and efficacy of drugs is inextricably intertwined with things other than recognition of active ingredients. Since this is a matter of most important public interest, I believe that a wise exercise of discretion requires denial of preliminary injunctive relief until the issue can be explored in more depth than it has.

### ADDENDUM

Following completion of the foregoing opinion but before it was filed, the FDA requested an evidentiary hearing. The request was granted. It originated in the following fashion. Hoechst, the manufacturer of Lasix, obtained a sample of Pharmadyne furosemide tablets and ran some tests on them. The results of these tests were made available to the FDA which desired to present them and related information to the court.

On January 8, 1979, testimony was taken from Victor J. Bauer, Ph.D. and vice-president of Hoechst. In addition, the FDA filed its direct testimony of several other witnesses by affidavit, and was ordered to have these affiants available for cross-examination by plaintiff at plaintiff's demand. Counsel for plaintiff conducted some cross-examination of Dr. Bauer, but on January 9, 1979 placed on the record his waiver of the right to cross-examine the FDA's affiants.

After qualifying as an organic chemist, Dr. Bauer testified as to the tests run under his supervision and the results thereof. The principal finding was that dicalcium phosphate is used as an excipient in Pharmadyne's furosemide while lactose is used in Lasix.

Bernard E. Cabana holds a Ph.D. in Pharmacology and is employed by the FDA. Among other things, his affidavit stresses that changes in such things as particle size, identity of inert ingredients, etc. may have definite effects upon bioavailability and bioequivalence. Such changes may lead to toxicity and therapeutic failure. Dr. Cabana believes that the substitution of dicalcium phosphate for lactose in Pharmadyne's furosemide product makes plaintiff's product a potential hazard in the marketplace in the absence of further proof of *in vivo* bioavailability. Dr. Cabana opines that plaintiff's excipient is "very likely to interfere with the dissolution of the product in the intestine thereby rendering the product ineffective at the prescribed dosage of Lasix." Dr. Cabana points out that Lasix is used for chronic illnesses—e. g., congestive heart failure, the edema secondary to cirrhosis—and highlights the problems that would result if a patient titrated to Lasix is switched to a supposedly identical drug which, however, is not a therapeutic equivalent. Dr. Cabana also refers to the dangers of "dumping" of the contents of a sustained release medication.

The FDA has also supplied the affidavit of J. Richard Crout, M. D., a board certified internist with a special interest in hypertension. Among other things, Dr. Crout mentions state generic substitution laws [1a] and opines that the purpose of these laws may be impaired if all generic drugs supposedly identical to each other do not bear the FDA approval implicit in premarketing clearance.[2a]

1a. Dr. Crout says that 34 states have enacted such laws. I will accept his word for it. The count of 31 such laws I mention in the opinion was made a year ago in connection with another case.

2a. The FDA also filed an affidavit from Robert Shulman, president of Bolar Pharmaceutical Company, Inc., a generic manufacturer. He says that Bolar wholeheartedly supports the requirement of premarketing FDA approval for generic drugs, primarily on the basis of safety and therapeutic efficacy. It is also stated that failure to require premarketing approval will harm the generic drug movement by depriving generic drugs of the uniform FDA approval, thereby permitting the large manufacturers to argue to the public and to the medical profes-

There is no point in reciting the contents of these affidavits in detail. To some extent they present legal argument that parallels the opinion. Their factual assertions, however, only strengthen my determination that the *Lannett* dictum raises serious issues concerning the public safety. I am more convinced than ever that the *Lannett* dictum is incorrect, and I still believe that before it becomes the uniform law of the nation it should be reexamined and subjected to the most intense scrutiny.

sion that if they are getting generic drugs they may be getting drugs that have no FDA approval. This would discourage the use of generic products.

Mr. Shulman asserts that his company keeps products "off the market while testing and securing ANDA approval." In response to this statement, plaintiff, with some delight, hastened to show that in 1976 Bolar was named defendant in three seizure actions in which it was charged with having marketed new drugs without the required premarketing approval. These actions have by this time been terminated.