**PREMO PHARMACEUTICAL LABORA-
TORIES, INC., Plaintiff,**

v.

**UNITED STATES of America, Joseph A.
Califano, Jr., Secretary of Health, Edu-
cation and Welfare, and Donald M. Ken-
nedy, Commissioner of Food and Drugs,
Defendants.**

No. 78 Civ. 5435(MP).

United States District Court,
S. D. New York.

July 27, 1979.

Kirschstein, Kirschstein, Ottinger & Cobrin by David B. Kirschstein, New York City, Keller & Heckman by John S. Eldred and Deborah Shur Trinker, Washington, D. C., for plaintiff.

Robert B. Fiske, U. S. Atty., S.D.N.Y., by Janis Farrell and John M. O'Connor, Asst. U. S. Attys., New York City, for U. S. and H. E. W.

Jacqueline H. Eagle, Rockville, Md., for Food and Drug Administration.

## OPINION

POLLACK, District Judge.

This is a suit by a manufacturer of pharmaceutical drugs against the Secretary of Health, Education and Welfare and the Commissioner of Food and Drugs, seeking a declaratory judgment that a questioned product manufactured by the plaintiff is not classifiable as a new drug and therefore may be freely sold and distributed without prior approval by the Food and Drug Administration ("FDA" hereafter). The FDA has initiated seizure actions against the product in four states and has threatened to seize it elsewhere. Thus there exists a justiciable controversy between the parties, and the Court has jurisdiction of the suit under 5 U.S.C. §§ 701–706; 21 U.S.C. § 301 et seq.; and 28 U.S.C. §§ 1331(a) and 2201.

Temporary relief by way of preliminary injunction was denied, and the issues were presented at a bench trial. For the reasons appearing hereafter the plaintiff, having established its right to relief by the requisite preponderance of credible evidence, will be awarded the declaratory judgment it seeks.

The plaintiff manufactures a tablet known as "Insulase," which is intended for use in the treatment of adults with mild to moderate chronic diabetes. The active ingredient in Insulase is the chemical chlorpropamide ("CPA" hereafter). CPA is also the active ingredient in a tablet manufactured by Pfizer Laboratories, Inc., "Diabinese," which is likewise used to treat diabetes. The inactive ingredients in Diabinese and Insulase, however, are not the same.

The plaintiff now sues for a declaratory judgment that Insulase is not a "new drug" within the meaning of section 201(p) of the Food, Drug and Cosmetic Act, 21 U.S.C. § 321(p). That section defines "new drug" as "[a]ny drug not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs as safe and effective for use under the conditions prescribed, recommended, or suggested in the labelling thereof. . . ." As noted above, if Insulase is not a "new drug" then it may be marketed without the prior approval of the FDA.

Diabinese was approved by the FDA over 20 years ago and has since been widely prescribed by physicians in the treatment of adult diabetics. The defendants concede that both Diabinese and CPA are generally recognized as safe and effective and that the inactive ingredients in Insulase are individually recognized as safe. The question, then, is whether the different combinations of inactive ingredients in Diabinese and Insulase make the latter a "new drug." Before addressing that question, it is necessary to set forth some terminology used in the analysis of drugs.

A *drug product* is a particular drug made by a particular manufacturer. Thus Diabinese and Insulase are different drug prod-

ucts, even though their active ingredients are the same. A drug product normally includes an *active ingredient* and various inactive ingredients, known collectively as excipients. Excipients may include binders mixed with the active ingredient to form a tablet, coatings, colorings, flavors, etc.

The *bio-availability* of a drug product is the *time* within which the active ingredient reaches the site of its intended action in the body, together with the *amount* of the active ingredient that reaches that site. *See* 21 C.F.R. § 320.1(a). Bio-availability is measured clinically by administering the drug to a subject and measuring periodically thereafter the amount of the active ingredient present at the site of its intended action (or, if measurements cannot be taken at that site, then by measuring the amount of the active ingredient present in the bloodstream). The results of these measurements can be displayed on a graph in which the time since the drug was taken is shown on the horizontal axis and the measured amount of active ingredient shown on the vertical axis. If the results of each measurement are plotted on the graph, they will form a curve that begins where the two axes intersect (representing the time when the subject first took the drug and had none of the active ingredient in his bloodstream), then rises to a peak (representing the time when the subject had the greatest amount of the active ingredient in his bloodstream), and ultimately falls back to the horizontal axis (representing the time when the subject had eliminated all of the active ingredient from his bloodstream).

When such a curve is drawn it is possible to determine the three values by which the bio-availability of a drug product is measured, namely, *C-max, T-max*, and the *area under the curve*. C-max (which stands for maximum concentration) is the greatest amount of the active ingredient found to be present in the bloodstream during any one measurement. It is represented by the peak of the curve. T-max is the time after administration of the drug at which C-max occurs. The area under the curve is the area enclosed by the curve and the horizontal axis and is a measure of the total amount of the active ingredient that was present in the body from the time when the drug was taken through the time when all of the active ingredient was eliminated.

The foregoing method of measuring bio-availability may be used when a drug product is to be taken so infrequently that all of the active ingredient from one dose is eliminated from the body before another dose is taken. CPA tablets, however, are normally taken daily, yet some of their active ingredient remains in the body for as much as a week. Thus when a patient begins a regimen of CPA tablets, the amount of CPA in his bloodstream will rise daily to an even-higher maximum until it reaches a *steady state*. In this steady state, the amount of CPA in the bloodstream will rise to a certain level after the patient has taken his daily tablet, then fall to a certain level as CPA is eliminated from the body later in the day, then rise again to the previous high level after the patient takes his tablet on the next day, and so on. The high level reached daily after taking the tablet is the *maximum steady state level*, the low level is the *minimum steady state level*, and the average amount of CPA in the bloodstream during steady state is the *mean steady state level.*

Although the term "new drug" is defined in the Act, its application in a case like this is unsettled.

■ The plaintiff argues that the word "drug" in the terms "new drug" denotes only the active ingredient in a drug product and, therefore, that if an active ingredient is generally recognized to be safe and effective, then a drug product containing that active ingredient is not a "new drug". This interpretation of "new drug," however, runs afoul of section 201(g)(1)(B) of the Act, 21 U.S.C. § 321(g)(1)(B), which defines "drug" as "articles intended for use in the diagnosis, cure, mitigation treatment, or prevention of disease in man. . . ." The word "articles," as used in this definition, is quite broad enough to encompass drug products as well as active ingredients. Further, the interpretation advocated by

the plaintiff has been rejected by the courts, which have not distinguished between the general recognition of active and inactive ingredients in determining whether a drug product is a "new drug." *See United States v. X-Otag Plus Tablets*, 441 F. Supp. 105 111 (D.Colo.1977) (citing cases). Furthermore, the evidence shows that differences in excipients may impair the safety or effectiveness of a drug product even though its active ingredient is generally recognized as safe and effective. For example, the coating of a tablet used to treat acute conditions may dissolve so slowly that the active ingredient does not reach the site of its intended action in time to do any good. For all these reasons, the Court must reject the view that the term "new drug" denotes only active ingredients. *Cf. United States v. Articles of Drug (Lannett Co.)*, 585 F.2d 575, 582–83 (3d Cir. 1978).

The defendants have taken three positions during this litigation on the meaning of the term "new drug." First they have argued that a drug product is a "new drug" if that particular drug product is not generally recognized to be safe and effective. Since a particular drug product cannot gain general recognition before it is used, this interpretation would require FDA approval for all drug products. As a result it would frustrate the long-recognized purpose of the Act to allow the marketing of safe and effective "me-too" drug products without costly and time-consuming FDA approval. *See Weinberger v. Hynson, Westcott & Dunning*, 412 U.S. 609, 614, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *Lannett, supra*, 585 F.2d at 583; *cf. Pharmadyne Laboratories, Inc. v. Kennedy*, 466 F.Supp. 100 (D.N.J. 1979), *aff'd on other grounds*, 596 F.2d 568 (3d Cir. 1979).

The defendants have also argued that a drug product is a "new drug" if its combination of excipients differs in any way whatsoever from the combination of excipients in an approved and recognized drug product, even if the active ingredients in the two drug products are identical and even if the excipients in the "me-too" product are individually recognized as safe. This interpretation, too, is far too broad. It would require FDA approval for "me-too" drug products even when there was no reason at all to believe that differences in their excipients made the "me-too" product less safe or effective than the old product. *See* 21 C.F.R. § 320.1(c) (under FDA definition, "pharmaceutical equivalents" need "not necessarily [contain] the same inactive ingredients"); *see also Weinberger v. Hynson, Westcott & Dunning, supra*, 412 U.S. at 614, 93 S.Ct. 2469 ("me-too" drug products "are *similar to* or identical with" products approved by FDA) (emphasis added).

Finally, the defendants have argued that a drug product is a "new drug" if there is any difference whatsoever between the bio-availability curves of the two drug products. Again the defendants' interpretation is too broad. The evidence shows, as the FDA has recognized, that some differences in bio-availability do not affect "the attainment of effective body drug concentrations on chronic use, or are considered medically insignificant for the particular drug product studied." 21 C.F.R. § 320.1(e).

■ In interpreting the term "new drug" the Court is mindful that some differences in excipients do affect the safety or effectiveness of a drug product, but that others do not, and that Congress has entrusted the FDA, not the Court, with finally determining the safety and effectiveness of drugs. Accordingly, when the active ingredient in a questioned drug product is the same as the active ingredient in a drug product already on the market and generally recognized as safe and effective, and when the excipients in the two drug products are different, and when the excipients in the questioned product are generally recognized individually to be safe, the manufacturer of the questioned product is entitled to a declaration that its product is not a "new drug" within the meaning of 21 U.S.C. § 321(p), only if, the evidence has shown no reasonable possibility that differences between the excipients in the recognized and questioned products will make the questioned product less safe or effective than the recognized product. *See United States*

*v. An Article of Drug . . . "Entrol-C Medicated,"* 513 F.2d 1127, 1129 fn. 5 (9th Cir. 1975); *United States v. Articles of Drug Labelled Colchicine,* 442 F.Supp. 1236, 1242 (S.D.N.Y.1978).

In the present case, the plaintiff's experts conducted a study of the bio-availability of Diabinese and Insulase by administering each tablet to subjects and measuring the amount of CPA in the bloodstream of each subject periodically thereafter. The Court finds that this study was conducted in accordance with accepted and reliable scientific methods. The results of the study were as follows:

| Hours after administration of tablet | Micrograms of CPA per milliliter of blood serum, mean for all subjects | |
| --- | --- | --- |
| | Insulase | Diabinese |
| .5 | 9.4 | 24.9 |
| 1 | 14.0 | 31.5 |
| 2 | 23.5 | 32.9 |
| 3 | 24.7 | 32.5 |
| 4 | 27.9 | 29.5 |
| 8 | 26.3 | 24.9 |
| 12 | 23.6 | 22.6 |
| 24 | 18.4 | 18.8 |
| 48 | 11.9 | 13.4 |
| 72 | 9.4 | 9.8 |
| 96 | 7.3 | 6.8 |
| 168 | 3.6 | 3.0 |
| 216 | 0.7 | 1.0 |

The mean peak concentration of CPA in the body (C-max) for Diabinese was 36.75 micrograms per milliliter of blood serum; for Insulase it was 30.43. The mean time taken to reach C-max (T-max) was 1.55 hours for Diabinese and 3.95 hours for Insulase. The mean total amount of CPA found in the bloodstream (area under the curve) was 1801 micrograms for Diabinese and 1740 for Insulase. In sum, the amount of CPA in the bloodstream rose faster and to a higher peak after taking Diabinese than after taking Insulase, and the former deliv- ered roughly 3.4% more CPA overall than did the latter.

With the data from the experimental study, the plaintiff's experts used an accepted equation to predict the amount of CPA that would be found in the bloodstream of patients who took CPA tablets daily, the so-called steady state level. They found that the amount of CPA in the bloodstream of a patient taking Diabinese daily would fluctuate between 67 and 90 micrograms per milliliter, with a mean of 78, and that in a patient taking Insulase the level would fluctuate between 64 and 86, with a mean of 77.

The plaintiff introduced credible scientific and medical testimony, amply supported by the scientific literature introduced into evidence, that the differences in the bio- availability of Diabinese and Insulase will not make the latter less safe or effective than the former, or, as the FDA has put it, are "medically insignificant." 21 C.F.R. § 320.1(c). Because CPA tablets are to be taken daily over a lengthy period for the treatment of a chronic condition, it is estab- lished by the evidence to be of no clinical significance that Diabinese delivers more CPA than Insulase soon after the first tab- let is taken. The important factor accord- ing to the evidence that the Court accepts is rather the steady state blood levels that the patient will reach during his regimen. On this score the Court accepts the testimony of the plaintiff's experts that the differ- ences in the steady state blood levels achieved by the two products are not signif- icant and, therefore, that Insulase is not less safe or effective than Diabinese.[1]

The defendants' experts have persuaded the Court only that, whenever the bio-avail- ability curves of two products differ, there is a theoretical possibility that one product will be less safe or effective than the other. In the face of the plaintiff's evidence, how- ever, this theoretical possibility is not

---

1. The plaintiff's expert Dr. Greene testified fur- ther that no matter how fast the CPA gets into the bloodstream or how big a dose is given, short of one with a potential for toxicity, once there is a certain threshold increase in the blood level of CPA, the drug will not have nay increased effect. The excess does not pass out of the system, but remains there without phar- macological effect. Dr. Greene's testimony was amply supported by the scientific litera- ture he cited and was uncontradicted by the defendants.

enough: the defendants must show some reasonable possibility that *these* differences in the bio-availability of *these* products will affect the safety or effectiveness of Insulase. This they have not done.

It is with considerable diffidence that the Court essays to instruct the FDA on the subject of newness of pharmaceutical drugs. However, where, as here, such an unconvincing opposition is made by the agency in response to solid proofs from credible sources concerning the therapeutic safety and bio-equivalence of a medicine having the same active ingredients as an approved item on the market and containing perfectly safe excipients, the Court has no choice but to declare that the questioned medicine is not new and perforce needs no advance approval from the agency. Speculative questions raised on hypotheses do not suffice to cast the doubts to be regarded by the Court.

Accordingly, judgment will be entered declaring that the drug product Insulase is not a "new drug" within the meaning of 21 U.S.C. § 321(p).